Elliot Gale (Bar #263326)
egale@gajplaw.com
Joe Angelo (Bar #268542)
jangelo@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorneys for Plaintiff
Alma Polanco

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| Alma Polanco<br><br>                    Plaintiff,<br><br>        v.<br><br>Experian Information Solutions, Inc.;<br>Equifax Information Services, LLC;<br>Cash Central of California, LLC<br>                    Defendants. | CASE NO. 2:21-cv-03467<br><br>COMPLAINT FOR DAMAGES:<br><br>1. Violation of Fair Credit Reporting Act;<br>2. Violation of California Consumer Credit Reporting Agencies Act |

COMES NOW Plaintiff Alma Polanco, an individual, based on information and belief, to allege as follows:

## **INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. §

1

1681i(a)(4)), and 15 U.S.C. §1681i(a)(5)(A)), and the California Consumer Credit Reporting Agencies Act, California Civil Code §1785.25(a).

2. Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's account with Cash Central of California, LLC (hereinafter "Cash Central").

3. Here, Cash Central never updated Plaintiff's credit account to reflect it included and discharged in bankruptcy.  Instead, Cash Central and Experian continue to report the account as charged off with a balance owed.

4. Equifax is also reporting an account with CashCall, Inc. that is charged-off rather than included/discharged in bankruptcy.

5. Such reporting is wholly inaccurate, misleading, and adversely impacts Plaintiff's credit worthiness.

6. Plaintiff's credit score has been adversely impacted by the reporting; he has been unable to rebuild his credit score and obtain favorable interest rates.

7. Third parties have been exposed to the inaccurate Cash Central and Cashcall tradelines.

8. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

## JURISDICTION & VENUE

9. Plaintiff re-alleges and incorporates herein by reference the allegations in each and every paragraph above, fully set forth herein.

10. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

11. The venue is proper pursuant to 28 U.S.C. §1391(b)(1).

12. Plaintiff lives in Los Angeles, California and entered into the transactions with the defendants in the State of California.

## GENERAL ALLEGATIONS

13. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for accurate credit reporting in an attempt to purposefully undermine Plaintiff's attempt to improve his FICO Score.

14. In the alternative Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

15. FICO is a leading analytics software company with its principal headquarters located in San Jose California.  FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

16. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

17. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan.  FICO periodically updates its scoring models resulting in multiple FICO Score versions.

18. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

19. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

20. There are 28 FICO Scores that are commonly used by lenders.

21. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

22. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

23. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

24. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.

25. Each of the five factors is weighted differently by FICO.

26. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

27. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

28. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently they occurred, and how many delinquent accounts exist.

29. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

30. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

31. A consumer's FICO score is negatively impacted when an adverse authorized user account is reported.

**Metro 2**

32. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

33. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format.  The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt.  Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

34. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

35. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

36. The CDIA is *the* expert on accurate credit reporting.  In support of his allegations Plaintiff avers the following:

   a. The CDIA offers a FCRA certificate program for all CRAs.

   b. The CDIA offers a FCRA awareness program for all CRAs.

    c.  The CDIA offers a FCRA Certificate program for DFs.

    d.  The CDIA offers a FCRA awareness program for DFs.

    e.  The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

    f.  The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.

    g.  The CDIA developed a credit reporting resource guide for accurately reporting credit.

37. The CDIA's Metro 2 is accepted by all CRAs.

38. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).

39. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

40. The three main credit bureaus helped draft the CRRG.

41. The CRRG is not readily available to the public. It can be purchased online for $229.45.

42. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

43. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

44. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

45. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results.  If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

### e-OSCAR

46. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

47. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

48. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

### Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator

49. When a consumer files bankruptcy certain credit reporting industry standards exist.

50. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

51. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

52. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

53. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

54. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

55. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered.  This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

56. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

57. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

58. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

59. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

60. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

61. The lack of a CII reported also suggests that creditors are free to collect against a consumer as an individual or that no stay exists to prevent *in personam* collection activity.

62. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

63. Under the Fair Credit Reporting Act a bankruptcy can be reported for ten years.

64. The ten-year rule for reporting runs from the date the bankruptcy was *filed*.

65. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

66. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score. Failure to reference the bankruptcy filing (CII field) and or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

**Plaintiff's Bankruptcy**

67. Plaintiff filed for Chapter 13 bankruptcy protection on October 30, 2015 in order to discharge various debts and improve Plaintiff's credit worthiness and FICO score.

68. Plaintiff received a Chapter 13 discharge on September 8, 2020.

69. On October 16, 2020 Plaintiff ordered a credit report from Experian, Equifax, and TransUnion to ensure property reporting by Plaintiff's creditors after entry of her chapter 13 bankruptcy discharge.

70. Plaintiff noticed tradelines from Cash Central and CashCall on the October 16, 2020 credit report that was reporting inaccurate, misleading, and incomplete information regarding Plaintiff's accounts with those respective lenders.

71. Cash Central and Cashcall were all reporting that the various accounts were charged off and with balances owed without any notation that the accounts were subject to a bankruptcy discharge.

72. In response, Plaintiff disputed the inaccurate Cash Central, LendingClub, and Cashcall tradelines via certified mail with Experian, Equifax and TransUnion in October of 2020.

73. Plaintiff's dispute letter specifically put Cash Central and Cashcall on notice that Plaintiff had filed for bankruptcy and received a discharge and that the accounts should not be listed as charged off but rather as included and discharged in bankruptcy.

74. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter, and in response, sent Plaintiff's dispute to Cash Central, LendingClub, and CashCall via an ACDV through e-OSCAR.

75. A second dispute was sent out, against disputing the entries by the data furnishers, on January 11, 2021.

76. Claimant ordered credit reports on December 1, 2020 and March 3, 2021 after the statutory time period had passed for Plaintiff to receive a reinvestigation report from the CRAs, for the sole purpose of ensuring Plaintiff's accounts with Cash Central and CashCall were updated.

77. The Cash Central CashCall accounts on Plaintiff's Experian, Equifax, and TransUnion reports still listed the accounts as charged off and did not reflect that it was included or discharged in bankruptcy.

**Inaccuracy – Cash Central**

78. Plaintiff was frustrated to see that Defendant Cash Central did not properly update the account but instead continued to report Plaintiff's account as charged off and with an outstanding balance owed.

79. Cash Central did not update Plaintiff's account to indicate that it was included and discharged in bankruptcy – instead continuing to report on Plaintiff's credit report as if no bankruptcy was filed.

80. Such reporting makes it appear that Plaintiff is still obligated to make payments on the Cash Central debt and that the account was not included or discharged in bankruptcy.

81. Cash Central has not updated the CII to reflect that the account was ever subject to the terms of Plaintiff's Chapter 13 filing nor subsequently discharged.

82. Rather than updated the CII to an "H" Cash Central continues to report to TransUnion the account is charged off, consequently, appears that Plaintiff still must make payments to Cash Central on the account.

83. Such reporting remains entirely inaccurate.

**Willfulness**

84. Cash Central had actual knowledge of the bankruptcy but refused to update the CII.

85. This was not a negligent act by Cash Central but instead an intentional act to purposefully undermine Plaintiff's ability to effectively restore Plaintiff's credit through bankruptcy.

86. Cash Central is not following industry standards and is not listing the correct consumer information indicator (CII) as the CII should be updated to an "H" as Plaintiff's bankruptcy has been discharged.

87. By indicating that the account is charged-off without notating the bankruptcy it appears that Plaintiff has filed to address this outstanding account, still owes Cash Central money, and that the Cash Central account was not included/discharged in bankruptcy.

88. By notating the CII-H potential lenders are alerted to the fact that the account has been included and discharged in bankruptcy.

89. Once Cash Central received Plaintiff's dispute, rather than acknowledge the bankruptcy filing and subsequent discharge, Cash Central continued to report the account as if no bankruptcy had been filed and no discharge had been entered.

90. Cash Central's reporting of the charged-off and past-due balance notation is an attempt to have Plaintiff make payments on the account in order to remove the derogatory and inaccurate account information.

**Damages**

91. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, and emotional harm.

92. In addition, Plaintiff's fresh start has been irreparably harmed and continues to be harmed by the Cash Central and CashCall reporting as that reporting has been disclosed and disseminated to various third-party lenders.  Until Cash Central and CashCalls's reporting has been properly updated Plaintiff continues to appear a severe credit risk.

93. The actions of Experian, Equifax, and Cash Central as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**<u>FIRST CAUSE OF ACTION</u>**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants)

**Experian, and Equifax – Failure to Assure Credit Reporting Accuracy**

94. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

95. Experian and Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.

96. Had Experian and Equifax maintained reasonable procedures to assure maximum accuracy Experian and Equifax would never have allowed Defendants Cash Central and CashCall to report the account as described herein.

97. As a result of Experian and Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**Willfulness**

98. The violations described herein by Experian and Equifax were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

99. Experian and Equifax intentionally send consumer disputes to employees who do not live within the continental United States.

100. This is done intentionally to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.

101. These employees for Defendants Experian and Equifax receive little to know training concerning how to accurately report consumer debt.

102. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F.Supp. 2d 1074, 1083, 1088 (D. Or. 2007); *Grigoryan v. Experian Info. Sols*., Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols*., No. CV 14-05276-AB (ASX)

103. Experian and Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

104. Experian and Equifax have intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

105. Experian and Equifax also allowed Cash Central and CashCall to report the accounts post chapter 13 discharge with actual knowledge of Plaintiff's chapter 13 filing and subsequent discharge.

106. Experian and Equifax knew Plaintiff filed bankruptcy and received a discharge and yet somehow allowed Cash Central and Cashcall to report inaccurately and obviously outside of recognized industry standards.

107. Given that Experian and Equifax all helped draft the CRRG, and Plaintiff specifically referenced industry guidelines in the dispute letter Experian and Equifax knew that the Cash Central and CashCall accounts were not reporting in a manner consistent with industry standards i.e. accurate, but chose to do nothing.

108. Consequently, Defendants Experian and Equifax are liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Experian and Equifax were at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

109. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### SECOND CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendants)

**Cash Central – Failure to Reinvestigate.**

110. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

111. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the

information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

112. Defendant Cash Central violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

113. The CRAs provided notice to Cash Central that Plaintiff was disputing the inaccurate and misleading information, but Cash Central failed to conduct a reasonable investigation of the information.

114. Based on Plaintiff's dispute, Cash Central should have known its accounts were included in Plaintiff's Chapter 13 discharge.

115. The most basic investigation would include a simple review of well-established credit reporting industry standards.

116. Plaintiff alleges Cash Central did not review well established industry standards for credit reporting.

117. If Cash Central had reviewed such standards Cash Central would have seen its reporting was not in compliance and consequently inaccurate and or incomplete.

118. Such an investigation would be unreasonable.

119. Plaintiff also alleges that Cash Central did not investigate whether Plaintiff filed for bankruptcy and whether a discharge was entered.

120. The lack of investigation is unreasonable.

121. Plaintiff further alleges that Cash Central have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Equifax and Experian – Failure to Reinvestigate Disputed Information.**

122. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

123. After Plaintiff disputed the accounts mentioned above, Experian and Equifax were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.

124. Experian and Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

125. Plaintiff alleges that Experian and Equifax have its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.

126. Experian and Equifax are not passive entities bound to report whatever information a data furnisher, such as Cash Central or CashCall, provides.

127. Plaintiff alleges that Experian and Equifax are readily familiar with Metro 2 guidelines and credit reporting industry standards given that Experian and Equifax helped draft said guidelines.

128. In fact, Experian and Equifax all sponsor and authorize workshops hosted by the CDIA that teach the following to Data Furnishers:

   a.   Do not report delinquencies post-petition pre discharge in the payment history section regardless of Chapter 13 and instead report the Metro 2 indicator H once a discharge is entered.

   b.  The above reporting is the correct and accurate way to report debts included in consumer bankruptcy filings.

129. Given the aforementioned, Plaintiff alleges that Experian and Equifax can and do suppress inaccurate information from being reported when DFs provide inaccurate information.

130. Experian and Equifax can and do instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

131. Experian and Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that certain DFs were not following credit reporting industry standards.

132. Experian and Equifax would have known that Plaintiff filed for Chapter 13 based on multiple other accounts reporting as much.

133. Experian and Equifax would have known that Plaintiff received a chapter 13 discharge based on multiple other accounts reporting as much.

134. Experian and Equifax would have known that failure to report a CII given that a Chapter 13 was filed did not comply with industry standards.

135. In fact, Experian and Equifax all knew plaintiff filed for chapter 13 bankruptcy because its own public records section reflects that Plaintiff filed bankruptcy.

136. Experian and Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

137. Experian and Equifax intentionally, willfully or with reckless disregard for Plaintiff's accuracy did no investigation whatsoever given that Experian and Equifax's general policy is to simply parrot whatever information a data-furnishers sends.

138. Such policy and procedure inherently leads to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

### THIRD CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants)

**Experian and Equifax – Failure to Review and Consider All Relevant Information.**

139. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

140. Experian and Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

141. As a result of Experian and Equifax's violation of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

142. The violations by Experian and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

143. In the alternative, Experian and Equifax were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

144. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A)
Against Defendants)

**Experian and Equifax – Failure to Delete Disputed and Inaccurate Information.**

145. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

146. Experian and Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

147. As a result of Experian and Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

148. The violations by Experian and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

149. In the alternative, Experian and Equifax were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

150. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FIFTH CAUSE OF ACTION

(Violation of California Consumer Credit Reporting Agencies Act
California Civil Code § 1785.25(a) Against Defendants)

**Cash Central – Reporting Inaccurate Information to CRAs.**

151. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

152. In the regular course of its business operations, Cash Central routinely furnish information to credit reporting agencies pertaining to transactions between Defendants and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

153. Cash Central intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not follow with well-established industry standards.

154. Plaintiff alleges that Cash Central re-reported the information contained herein in violation of California Civil Code § 1785.25(a).

155. Plaintiff also allege that Cash Central had reason to know that the information reported on Plaintiff's account were misleading, inaccurate, and incomplete.

156. Plaintiff alleges that Cash Central had reason to know that by not complying with well-established industry standards lenders will draw a more negative inference with respect to Plaintiff's credit worthiness.

157. Plaintiff alleges that the dispute letters from all three credit reporting agencies, the consumer data industry resource guide, and results of its investigation should have provided notice to Cash Central of its misleading and inaccurate reporting.

158. Cash Central failed to notify Experian and Equifax that the information Cash Central re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).

159. Cash Central's communications of false information, and repeated failures to investigate, and correct their inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Plaintiff's rights.

160. As a direct and proximate result of Cash Central's willful and untrue communications, Plaintiff has suffered actual damages including but not limited to reviewing credit reports from all three consumer reporting agencies, time reviewing reports with counsel, sending demand letters, diminished credit score, denial of credit, and such further expenses in an amount to be determined at trial.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;

3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31

4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o; California Civil Code § 1785.31;

5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.


Dated: April 23, 2021

**Gale, Angelo, Johnson, & Pruett, P.C.**

*/s/ Joe Angelo*
Joe Angelo
Elliot Gale
Attorneys for Plaintiff


## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: April 23, 2021

*/s/ Joe Angelo*
Joe Angelo
Elliot Gale
Attorneys for Plaintiff